UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on May 7, 2012**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. |
| | : | |
| | : | **Grand Jury Original** |
| v. | : | |
| | : | **Charges:** |
| | : | |
| | : | **18 U.S.C. § 1343 (Wire Fraud)** |
| GARFIELD M. TAYLOR, | : | |
| | : | **18 U.S.C. § 2 (Aiding and Abetting and** |
| Defendant. | : | **Causing an Act to be Done)** |
| | : | |
| | : | **15 U.S.C. §§ 78j(b) and 78ff, and** |
| | : | **17 C.F.R. § 240.10b-5 (Securities Fraud)** |
| | : | |
| | : | **15 U.S.C. §§ 77e(a)(2) and 77x, and** |
| | : | **17 C.F.R. § 2401.144 (Unlawful Sale of** |
| | : | **Unregistered Securities)** |
| | : | |
| | : | **18 U.S.C. § 981(a)(1)(C) &** |
| _____ | : | **28 U.S.C. § 2461(c) (Criminal Forfeiture)** |

**INDICTMENT**

The Grand Jury charges:

**<u>FRAUDULENT SCHEME</u>**

At various times relevant to this Indictment, in the District of Columbia ("the District")

and elsewhere:

<u>RELEVANT PERSONS AND ENTITIES</u>

1.      Defendant GARFIELD TAYLOR resided in Montgomery County, Maryland.

From in or about 2000 through in or about 2010, he ran a number of businesses that traded

securities.  GARFIELD TAYLOR did not have any brokerage or trading licenses.

2.      Garfield Taylor Incorporated ("GTI") was originally incorporated by GARFIELD TAYLOR on February 15, 2000, in Maryland. GTI's principal office was in the District. From at least 2005 until in or about March 2010, GTI collected funds from investors. Although GTI held itself out as providing a number of services to its clients, the company had two principal lines of business: i) buying and selling securities with investor funds; and ii) renovating homes.

3.      Gibraltar Asset Management Group, LLC, a/k/a Gibraltar Asset Management Group, Inc. ("Gibraltar") was organized on April 24, 2008, as a Virginia limited liability company. Gibraltar's principal office was in the District. GARFIELD TAYLOR had a 65% membership interest and was the CEO of the company. Gibraltar was held out to have been organized for the purpose of making "covered call" investments and other business related activities. The term "covered call" refers to a method of trading options, that is, the right to buy or sell a stock at a certain price. In a covered-call strategy, the person selling the right to buy stock protects against losses by actually possessing the stocks he is selling the right to buy. In other words, if he traded the right to purchase stock at a certain price, he would possess enough of the stock to sell if an investor exercised his or her right to purchase the stock; he would be "covered" on the bet. From at least July 2008 until in or about May 2010, GIBRALTAR collected funds from investors.

## The Scheme to Defraud

4.      From at least in or about September 2006 through at least in or about September 2010, GARFIELD TAYLOR perpetrated a scheme to defraud by inducing individuals, through a series of false representations, to invest in businesses he controlled. The common theme to these false representations was that an investment with an entity that GARFIELD TAYLOR controlled would be both safe and lucrative. TAYLOR and others acting at his direction routinely

2

represented that TAYLOR was able to provide his customers above-market returns through a covered-call trading strategy; that he had a proven track record of trading successes; and that the principal invested would remain intact.

5.      In truth and in fact, as GARFIELD TAYLOR well knew, these representations were false and misleading.  TAYLOR failed to disclose that he was actively trading the investors' original investments, including their principal, and engaging in trading strategies that involved a high degree of risk.  Moreover, TAYLOR failed to disclose that he was using other investors' principal–not trading profits–to pay for the large returns he had promised to earlier investors.  Indeed, TAYLOR failed to inform investors that his purported history of trading success was made up; that he never performed an analysis of his historical yearly rate of return; and that any analysis between 2005 and 2009 would have shown either net losses for those years or minimal profits nowhere near the amount of money needed to satisfy the returns he promised investors.

6.      During the relevant period, GARFIELD TAYLOR used GTI and GIBRALTAR as vehicles for his fraudulent scheme.  With both of these entities, TAYLOR used the illusion of a safe trading strategy that had previously generated above-market returns to lure investors.

7.      In the course of carrying out this scheme, GARFIELD TAYLOR and others acting at his direction took the money procured through false pretenses and, in large part, failed to honor the commitments that were made to investors.  TAYLOR, GTI, and Gibraltar did not engage in the covered-call trading strategy that he had touted to investors.  To the contrary, TAYLOR and these corporate entities pursued highly risky trading strategies, resulting in overwhelming losses over the relevant time period, and took no steps to protect investor principal.  TAYLOR continued to tout his history of success and the safety of an investment with

3

him, even after losing or misappropriating nearly all of the approximately $6 million invested by a single investor.

8.     As a direct result of this scheme, from in or about September 2006 through in or about September 2010, GARFIELD TAYLOR and others acting at his direction induced millions in investments, largely from individual investors and charitable organizations.  By fall 2010, TAYLOR—by (i) pursuing a highly risking trading strategy; (ii) using investor principal to make interest payments; and (iii) using investor funds to enrich himself and others—lacked the funds to pay investors either the interest they were due or their principal.  At the time of his scheme's collapse, he owed approximately $25 million in principal to investors.

GTI

9.     GTI was the original entity that GARFIELD TAYLOR used to lure investors. Although Taylor held out the company to have a number of different lines of business, the only lines of business that GTI actually engaged in were remodeling homes and investing in the securities market.

10.     GARFIELD TAYLOR entered into contracts with his GTI investors, which were styled as a "loan" from the investor to GTI.  The contracts set forth the amount of principal to be invested; the term of the loan (typically 12 or 24 months); the interest rate on the loan (typically 20 percent); and the amount of interest due per month.  The contracts also represented that the principal investment would be repaid when the contracts became mature.

11.     To lure GTI investors into executing these contracts, GARFIELD TAYLOR falsely represented to them that he had a safe trading strategy that he had previously used to generate above-market returns.  TAYLOR commonly elaborated on this false statement, providing additional, false comfort to prospective investors about the safety of their investments.

Such additional false assurances included that: i) loans to GTI were insured against loss; ii) GTI maintained a reserve account to protect against loss; iii) that GTI executed a covered-call strategy to protect against loss; and iv) loans were insured by the Federal Deposit Insurance Corporation.  In truth and in fact, as TAYLOR well knew, each of these representations was false and misleading.

12.     As a result of GARFIELD TAYLOR's false and misleading representations about his use of a safe, secure, and effective trading strategy, individuals invested with GTI and lost hundreds of thousands of dollars.

*Investors 1 and 2*

13.     In or about mid-2006, Investors 1 and 2 met with GARFIELD TAYLOR in the District to discuss investing money with GTI.  Investors 1 and 2 informed TAYLOR that they were looking for safe and secure investment opportunities to generate funds to help them send their autistic child to private school.  TAYLOR falsely advised Investors 1 and 2 that the money invested would be safe, and specifically falsely represented that: i) their money would be invested in options and covered calls; ii) that because of his trading strategy, TAYLOR had previously been successful in all markets; iii) that it was impossible for TAYLOR to lose money; and iv) that their principal would be safe.

14.     On or about September 5, 2006, Investors 1 and 2 obtained an official check for $193,000 made out to "Garfield Taylor Inc."  The funds for the check came from a home equity line of credit that Investors 1 and 2 opened on their home.

15.     On or about September 8, 2006, Investors 1 and 2 signed a note agreeing to invest $193,000 with GTI.  The note required GTI to return the $193,000 principal after a 12-month term and to pay a 20 percent annual rate of return on these funds.

16.     On or about September 11, 2006, GARFIELD TAYLOR deposited the $193,000

check in a GTI account at a bank located within the District. As part of the bank's standard

procedures for processing checks, electronic communications were sent from the District to

Maryland in connection with this $193,000 deposit.

17.     From on or about September 8, 2006, through on or about April 5, 2007, GTI paid

Investors 1 and 2 the interest payments they were contractually due.

18.     In or around April 2007, GARFIELD TAYLOR asked Investors 1 and 2 if they

had any additional funds to lend and offered to pay a 25 percent annual rate of return on any

additional funds invested.

19.     When soliciting these additional funds, GARFIELD TAYLOR failed to disclose

to Investors 1 and 2 that between September 8, 2006, and April 2007 GTI failed to generate

sufficient trading profits to pay back the interest that was contractually due to its investors and

that the only way it was able to create the illusion of a 20 percent annual profit was to use other

investors' principal to fund interest payments.

20.     On or about April 5, 2007, Investors 1 and 2 signed a note agreeing to invest

$30,000 with GTI.  The note required GTI to return the $30,000 principal after a 3-month term

and to pay a 25 percent annual rate of return on these funds.

21.     On or about April 5, 2007, Investors 1 and 2 electronically wired $30,000 from

their bank account to a bank account controlled by GTI located in the District.

22.     In or about September 2009, GTI began paying Investors 1 and 2 their interest

payments after they were due, and by April 2010, GTI ceased making the interest payments it

was contractually obligated to make.  Further, GTI failed to pay back the $223,000 principal

investment it was contractually obligated to return to Investors 1 and 2.

*Investors 3 and 4*

23.     In or about early 2008, Investors 3 and 4 met with GARFIELD TAYLOR in the

District to discuss investment opportunities with him.  Investors 3 and 4 explained that they were

planning on moving in the near future, but wanted to explore short-term trading options for

investing the equity in their current home.  TAYLOR falsely stated that: i) he had been trading

for some time with good results; ii) he traded covered calls; iii) money lent to him was insured;

and iv) he maintained a reserve account to protect against losses.

24.     On or about February 14, 2008, Investors 3 and 4 signed a note agreeing to invest

$200,000 with GTI.  The note required GTI to return the $200,000 principal after a 24-month

term and to pay a 20 percent annual rate of return on these funds.

25.     On or about February 15, 2008, Investor 3 issued a check to "Garfield Taylor

Inc." for $200,000.  Investors 3 and 4 obtained the $200,000 by refinancing their home.

GARFIELD TAYLOR facilitated the refinancing by arranging for a mortgage broker to travel to

the home of Investors 3 and 4 and to complete the paperwork for the refinance at their home.

26.     On or about February 25, 2008, GARFIELD TAYLOR deposited the $200,000

check in a GTI account at a bank located within the District.  As part of the bank's standard

procedures for processing checks, electronic communications were sent from the District to

Maryland in connection with this $200,000 deposit.

27.     Contrary to his representations that he would invest in covered call options,

GARFIELD TAYLOR immediately used funds invested by Investors 3 and 4 for different

purposes.  For example,

> a) On or about February 26, 2008, TAYLOR transferred $100,000 from the GTI
>    Account to his personal trading account.  This transfer would not have been
>    possible without the funds of Investors 3 and 4, as the GTI Account had only

$61,778 in it before TAYLOR deposited their funds. TAYLOR lost the $100,000 in options trading in or before April 2008;

b) Between on or about February 26, 2008 and February 29, 2008, TAYLOR used approximately $47,000 of the funds remaining in the account to pay other investors' principal and interest payments;

c) On or about February 26, 2008, TAYLOR used $5,000 of the funds remaining in the account to pay down the balance on a personal credit card; and

d) On or about February 27, 2008, TAYLOR transferred $30,000 of the funds remaining to the account to another account. After transferring the funds, TAYLOR used the overwhelming majority of the funds to pay other investors' principal and interest payments and other GTI-related fees.

28.     From in or about February 2008 through in or about June 2009, GTI paid Investors 3 and 4 the interest payments they were contractually due.

29.     In or around Summer 2009, GARFIELD TAYLOR asked Investor 3 to loan an additional $40,000 to GTI on a short-term basis. When soliciting these additional funds, TAYLOR failed to disclose to Investor 3 that between February 2008 and June 2009 GTI failed to generate sufficient trading profits to pay back the interest that was contractually due to its investors and that the only way it was able to create the illusion of a 20 percent annual profit was to use other investors' principal to fund interest payments. Nor did he disclose that funds invested were not insured against loss.

30.     In or about November 2009, Investors 3 and 4 asked GARFIELD TAYLOR to return the principal they had lent to GTI. TAYLOR informed them that he did not currently have the money, but would have it soon. Despite this representation, TAYLOR never repaid the $200,000 in principal that was due and Investors 3 and 4 ceased receiving the interest payments they were contractually due in May 2010.

Gibraltar

31.     In or about the first quarter of 2008, GARFIELD TAYLOR and several other individuals agreed to form Gibraltar.  The company was billed as an additional platform on which TAYLOR could demonstrate, and beneficially use, his trading expertise.

32.     With a 65 percent ownership stake and the title of CEO, GARFIELD TAYLOR was in charge of Gibraltar's activities; he was the only principal of Gibraltar who had complete access to the company's financial records; and he was the only principal who was consistently involved in both investor meetings and the company's trading activities.

33.     As CEO, GARFIELD TAYLOR participated in recruiting the other corporate officers who worked at Gibraltar, provided those officers with fictitious background information about the success of the purported covered-call trading strategy, and frequently directed the activities of those corporate officers on behalf of Gibraltar.

34.     Starting in or about May 2008, Gibraltar offered an investment opportunity pursuant to the terms of a private placement memorandum.

35.     Under the private placement memorandum, Gibraltar was offering promissory notes that were similar, in kind, to the promissory notes that GTI had offered prior to Gibraltar's formation.  The private placement memorandum described these promissory notes as "securities," but explained that–consistent with Securities and Exchange Commission ("SEC") rules–these securities need not be registered with the SEC.

36.     The offering document for the promissory notes asserted at least three times that Gibraltar planned to use the money raised through the offering to invest in covered calls.

37.     GARFIELD TAYLOR and corporate officers of Gibraltar acting at TAYLOR's direction lured investors by falsely claiming that Gibraltar had a safe trading strategy that had

previously generated above-market returns.  Indeed, several investors were previous GTI investors whom TAYLOR convinced to invest in Gibraltar based on the illusion that his GTI investment activity had been generating above-market interest rates.  As he did with GTI investors, TAYLOR commonly elaborated on his false statements to prospective Gibraltar investors, providing additional, false comfort about the safety of the investment.  Such additional false assurances included that: i) TAYLOR's trading strategy had consistently resulted in trading profits well in excess of 20%; ii) investor's principal would be safe; and iii) Gibraltar maintained a reserve fund to offset investor losses.

38.     As a result of GARFIELD TAYLOR's false representations about his use of a safe, secure, and effective trading strategy, individuals invested with Gibraltar and lost hundreds of thousands of dollars.

*Investors 5 and 6*

39.     In mid-2009, GARFIELD TAYLOR asked Investors 5 and 6, investors who first invested with GTI in March 2008, to invest with Gibraltar.

40.     Investors 5 and 6 original investment with GARFIELD TAYLOR occurred in or about March 2008.  Investor 5 and Taylor had a number of conversations prior Investors 5 and 6 deciding to invest with GTI in or about March 2008.  During the course of these conversations, Investor 5 explained to TAYLOR that he and his wife, Investor 6, had a newborn baby and that his wife was recently laid off from her job.  As such, they were interested in taking equity out of their home and investing the equity in a safe investment that could generate extra income.  In an effort to address Investor 5's concerns, TAYLOR falsely stated to Investor 5 that an investment with GTI would be a good fit because: i) he used a covered-call strategy; ii) the covered-call strategy protected investors from loss; iii) that the principal invested would not be lost; iv) funds

invested with him were insured and would not be lost; and v) TAYLOR was able to pay investors large returns because he, himself, made a 60-80% profit on his trades.

41.     On or about May 17, 2008, Investor 5 signed a note agreeing to invest $130,000 with GTI.  The note required GTI to pay back the $130,000 principal after a 12-month term and to pay a 20 percent annual rate of return on these funds.  Investors 5 and 6 issued a series of checks to GARFIELD TAYLOR under this investment agreement.

42.     On or about May 21, 2008, GARFIELD TAYLOR deposited a $30,000 check from Investor 5 at a Maryland branch of a bank that maintained a GTI account.

43.     On or about July 3, 2008, GARFIELD TAYLOR deposited a $57,000 check from Investor 6 at a District branch of a bank that maintained a GTI account.  As part of the bank's standard procedures for processing checks, electronic communications were sent from the District to Maryland in connection with this $57,000 deposit.

44.     From on or about May 21, 2008, through on or about November 17, 2009, GTI paid Investors 5 and 6 the interest they were contractually due.

45.     In mid-2009, GARFIELD TAYLOR contacted Investor 6 and asked her how her retirement investments were performing.  When Investor 6 stated that the value of her retirement account was decreasing, TAYLOR suggested that she transfer her retirement savings to him.

46.     When soliciting these additional funds, GARFIELD TAYLOR failed to disclose to Investor 6 that between May 2008 and November 2009 GTI and Gibraltar failed to generate sufficient trading profits to pay back the interest that was contractually due to their investors and that the only way he was able to create the illusion of a 20 percent annual profit was to use other investors' principal to fund interest payments.  TAYLOR also failed to correct the false and misleading statements that he had made in connection with the original investment.

11

47.     On or about October 19, 2009, Investor 6 submitted a request for a wire transfer of $70,552.46 from her retirement account to a Gibraltar account.

48.     On or about November 17, 2009, Investor 6 signed a note agreeing to lend Gibraltar $70,552.46.  The note required Gibraltar to pay back the $70,552.46 principal after a 36-month term and to pay a 20 percent annual return on these funds.

49.     On or about November 18, 2009, $70,552.46 was wired, per Investor 6's and GARFIELD TAYLOR's agreement, from California to a Gibraltar account within the District.

50.     Immediately prior to the November 18, 2009 transfer of $70,552.46, Gibraltar's primary checking account had a balance of $70,940.31. Almost none of this combined nearly $142,000 was ever invested.  Instead, these funds were used to make principal and interest payments to other GTI and Gibraltar investors and to make charitable donations.  After making these payments and charitable donations, only $943.00 remained in the Gibraltar account as of November 30, 2009.

51.     By mid-2010, both GTI and Gibraltar had ceased making the interest payments to Investors 5 and 6 they were contractually obligated to make.  Further, GTI and Gibraltar failed to pay back the principal that they were contractually obligated to return to Investors 5 and 6.

52.     After payment problems started in 2010, GARFIELD TAYLOR admitted to Investor 5 that he never used the covered-call strategy.

Hillcrest Funding LLC

53.     In or about Summer 2008, GARFIELD TAYLOR and other officers of GIBRALTAR met with the board of directors of Hillcrest, a non-profit children's organization, in an effort to convince the Board to invest Hillcrest funds with Gibraltar. During these meetings, GARFIELD TAYLOR,  and other officers of Gibraltar acting at his direction falsely

represented that: i) TAYLOR was able to generate profits in any market through the covered-call trading strategy he employed; ii) he had historical success employing this model; and iii) he would employ the covered-call strategy when managing Hillcrest's investment. Hillcrest ultimately agreed to invest $1.2 million with Gibraltar on a six-month trial basis with a 20 percent annual rate of return on these funds.

54.     Gibraltar timely made all of its payments under the $1.2 million trial investment. GARFIELD TAYLOR, and other officers of Gibraltar acting at his direction, failed to disclose that he had not executed a single covered-call during the trial period.

55.     On or about October 13, 2008, GARFIELD TAYLOR and other officers of Gibraltar acting at his direction asked Hillcrest board members to increase their organization's investment with Gibraltar. TAYLOR and attorneys of Gibraltar acting at his direction explained that Hillcrest could increase its funding in one of two ways: either Hillcrest could execute another promissory note or Hillcrest could set up an entity over which Hillcrest, Gibraltar, and TAYLOR would each have control.

56.     On or about February 28, 2009, Hillcrest, believing that the interest payments it had received to date were generated by a covered-call trading strategy, entered into a loan agreement in which Hillcrest agreed to lend up to $8 million to Hillcrest Funding LLC, an entity over which both Hillcrest and Gibraltar would have control, so that GARFIELD TAYLOR and Gibraltar could invest the funds.

57.     By in or around July 2009, Gibraltar ceased making the interest payments to Hillcrest it was contractually obligated to make, and Hillcrest's investment principal plummeted from approximately $6 million to $200.

13

Soliciting Additional Investors after Hillcrest's Collapse

58.     Undeterred by losing or misappropriating Hillcrest's $6 million investment, GARFIELD TAYLOR continued to solicit new investors, without disclosing this $6 million loss and any of his other investment losses. As he did with all of his previous investors, he continued to tout a safe trading strategy and a history of success.

*Investor 7*

59.     In or around October or November 2009, Investor 7 met with GARFIELD TAYLOR to discuss ways of investing a large, cash payout he was receiving in connection with an early retirement package. During the meeting, TAYLOR explained the covered-call strategy and falsely claimed that this strategy was used by Gibraltar. TAYLOR further falsely represented that there was only minimal risk associated with an investment with Gibraltar and that Gibraltar maintained a reserve fund to pay back principal if investor principal was lost.

60.     In or around November 2009, Investor 7 and GARFIELD TAYLOR orally agreed that Investor 7 would invest $500,000 with Gibraltar.

61.     On or about November 11, 2009, Investor 7 signed a note agreeing to invest $29,750 with Gibraltar. The note required Gibraltar to return the $29,750 principal after a 36-month term and to pay a 20 percent annual rate of return on these funds.

62.     On or about November 17, 2009, Investor 7 wired $29,750 from an account in California to a Gibraltar account located within the District.

63.     On or about February 23, 2010, Investor 7 signed a note agreeing to invest $44,800 with Gibraltar. The note required Gibraltar to return the $44,800 principal after a 36-month term, and to pay a 20 percent annual rate of return on these funds.

64.     On or about March 15, 2010, Gibraltar owed its investors millions of dollars in
principal, but its primary checking and trading accounts had a combined balance of less than
$1,200.

65.     On or about March 16, 2010, Investor 7 wired $44,800 from an account in
California to a Gibraltar account located within the District.

66.     By on or about April 6, 2010, despite Investor 7's infusion of $44,800, Gibraltar's
primary checking and trading accounts had a combined balance of less than $3,000.

67.     On or about April 7, 2010, consistent with his agreement to invest $500,000 with
GARFIELD TAYLOR, Investor 7 wired $425,000 from an account in California to a Gibraltar
account located within the District. TAYLOR did not disclose to Investor 7 that despite owing
millions of dollars to investors, Gibraltar's primary accounts had a combined balance of less than
$3,000 at the time of the wire transfer.

68.     Contrary to his representations, GARFIELD TAYLOR used a substantial portion
of the $425,000 investment for his own personal enrichment and to pay GTI and Gibraltar
expenses, including paying other Gibraltar and GTI investors. Indeed, approximately half of the
$425,000 was immediately transferred to pay "interest" and "principal" that TAYLOR was
contractually obligated to pay other individuals.

69.     In or about May 2010, when Investor 7 was due his first interest payment, he
received only a portion of the amount that he was due.

70.     In or about August 2010, Investor 7, having received no payments since the May
2010 payment, informed GARFIELD TAYLOR that he needed some of the money he was
contractually owed so that he could pay for his planned family vacation. TAYLOR gave

Investor 7 $10,000.  This $10,000 payment was the second, and final, payment Gibraltar made to Investor 7, and Investor 7 is still owed principal of nearly $500,000.

71.     After May 2010, Investor 7 had a number of conversations with GARFIELD TAYLOR, attempting to get his investment back.  In one of these conversations, TAYLOR admitted that he never executed the covered-call strategy.

*Investor 8*

72.     In spring 2010, GARFIELD TAYLOR asked Investor 8, an investor who first invested with TAYLOR in summer 2008, to invest with Gibraltar.

73.     Investor 8's original investment with GARFIELD TAYLOR occurred in or around summer 2008, shortly after TAYLOR told Investor 8 about Gibraltar.  TAYLOR falsely told Investor 8 that TAYLOR was going to use money invested in Gibraltar in a covered-call trading strategy and that TAYLOR had been successfully trading through this strategy for several years, earning profits that allowed him to pay investors between 15 percent and 25 percent on their investments.

74.     On or before August 27, 2008, Investor 8 decided that he wanted to invest with Gibraltar.  GARFIELD TAYLOR told Investor 8 to invest with GTI instead, falsely claiming that GTI was a holding company for Gibraltar.

75.     On or about August 27, 2008, Investor 8 issued a check for $50,000 to "GTI."

76.     On or about August 28, 2008, GARFIELD TAYLOR deposited the $50,000 in a GTI account.

77.     On or about September 8, 2008, Investor 8 issued a check for $500,000 to "GTI."

78.     On or about September 8, 2008, GARFIELD TAYLOR deposited the check for $500,000 at a District branch of a bank that maintained a GTI account.  As part of the bank's

standard procedures for processing checks, electronic communications were sent from the District to Maryland in connection with this $500,000 deposit.

79.     From in or about September 2008 through the first quarter of 2010, GTI paid Investor 8 the interest payments it was contractually obligated to pay.

80.     When soliciting Investor 8 in spring 2010 for an additional investment, GARFIELD TAYLOR admitted that he was seeking the additional funds because of some recent trading losses, but claimed that his business was still fundamentally sound and that he was experiencing only cash-flow problems.  In light of TAYLOR's statements, Investor 8 asked TAYLOR about the status of his initial investment.  TAYLOR falsely stated that Investor 8's original investment was secure and that all payments were on schedule.  Moreover, TAYLOR did not disclose to Investor 8 that between September 2008 and May 2010 GTI failed to generate sufficient trading profits to pay back the interest that was contractually due to its investors and that the only way he was able to create the illusion of a 20 percent annual profit was to use other investors' principal to fund interest payments.

81.     From on or about May 18, 2010, through on or about May 28, 2010, Gibraltar owed millions of dollars and had virtually no assets: its primary checking account had a *negative* balance of $66.59 and its trading account had a balance of only $78.00.

82.     On or about May 28, 2010, Investor 8, relying on GARFIELD TAYLOR's representations about Investor 8's original $550,000 investment being secure, issued a $200,000 check to Gibraltar.

83.     On or about May 28, 2010, GARFIELD TAYLOR used a remote check deposit device located in his office in the District to deposit the $200,000 in a Gibraltar bank account. As part of the standard procedures for processing such deposits, the bank that maintained the

Gibraltar account sent an electronic communication from the District to New York in connection with this $200,000 deposit.

84.     Contrary to his representations, GARFIELD TAYLOR used more than half of Investor 8's $200,000 investment to pay GTI and Gibraltar expenses, including paying other Gibraltar and GTI investors.

85.     In or about September 2010, Gibraltar and GTI ceased making the interest payments they were contractually required to make and did not pay any of the $750,000 in principal they were contractually obligated to pay back to Investor 8.

*Investors 9 and 10*

86.     In or about February 2010, Investors 9 and 10 met with GARFIELD TAYLOR in the District to discuss investment opportunities. During the meeting, TAYLOR explained the covered-call strategy and falsely claimed that this strategy was the strategy he was using with Gibraltar. TAYLOR further represented that the covered-call strategy always allowed him to earn money–or at worst break even–and that there was only a two to three percent chance that Investors 9 and 10 would not make money on their investment. Despite these representations, Investors 9 and 10 did not immediately invest.

87.     In or around July 2010, Investor 9 decided to invest with GARFIELD TAYLOR. When Investor 9 discussed investing with TAYLOR, TAYLOR falsely represented that Gibraltar had reached the maximum number of investors allowed by the SEC and claimed that she and her husband could no longer invest with Gibraltar. TAYLOR explained that Investors 9 and 10 could still invest with him by transferring Investor 9's retirement funds to an account TAYLOR could use to execute trades. TAYLOR proposed that he and Investors 9 and 10 would evenly

split his trading profits.  TAYLOR falsely led Investor 9 to believe that he would use the covered-call trading strategy he had previously discussed with her in managing the investment.

88.     On or about July 21, 2010, Investor 9 signed a note agreeing to place $500,000 in a trading account and authorizing GARFIELD TAYLOR to trade the funds for their mutual benefit with profits to be split evenly between the two.

89.     By on or about July 21, 2010, GARFIELD TAYLOR had already lost millions of dollars in bad options trades; and GTI and Gibraltar had ceased paying contractually required interest payments to a number of investors.  TAYLOR failed to disclose any of these facts to Investor 9 before inducing her to invest with him.

90.     On or about September 3, 2010, Investor 9 obtained a check, using nearly the entirety of her retirement account, for $450,000.

91.     On or about September 7, 2010, Investor 9 deposited the $450,000 check in the District in the trading account GARFIELD TAYLOR induced her to create.  As part of the standard procedures for processing such deposits, the bank that maintained the account sent interstate, electronic communications that terminated or originated within the District.

92.     On or about September 15, 2010, the $450,000 became available to trade.  Within a month of gaining access to these funds, GARFIELD TAYLOR lost nearly all of the $450,000 in naked options trading.

### Payments to GARFIELD TAYLOR and Others

93.     From on or about September 2006 through on or about September 2010, GARFIELD TAYLOR personally withdrew funds in excess of $2,500,000 from the corporate entities he controlled, even as those entities suffered overwhelming trading losses and ceased being able to make interest payments to investors.  Further, he hired at least two relatives as

19

employees of the corporate entities he controlled and paid salaries and commissions to them during the relevant time period.

94.     As a result of GARFIELD TAYLOR's scheme, the investors lost $24,426,998 in principal invested with him and the entities he controlled.

## COUNTS ONE THROUGH FIVE – WIRE FRAUD

95.     GARFIELD TAYLOR, to execute the scheme to defraud and to obtain money described above, did cause to be transmitted in interstate commerce and foreign commerce, by means of wire communications, the following signals and sounds:

| Count | Approximate Date | Wire Communication |
|---|---|---|
| 1. | 2/25/2008 | Interstate wire communication caused by depositing an investor's $200,000 check at a bank located within the District. |
| 2. | 11/18/2009 | Interstate wire transfer of a $70,552.46 investment that originated outside of the District and terminated within the District. |
| 3. | 4/7/2010 | Interstate wire transfer of a $425,000 investment that originated outside of the District and terminated within the District, |
| 4. | 5/28/2010 | Interstate wire communication caused by depositing an investor's $200,000 check at a bank located within the District. |
| 5. | 9/7/2010 | Interstate wire communication caused by depositing an investor's $450,000 check within the District. |

**(Wire Fraud, Causing an Act to Be Done, in violation of Title 18, United States Code, Sections 1343 and 2.)**

## COUNT SIX
### Securities Fraud
### (15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2)

96.     Paragraphs 1 through 94 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

97.     From at least in or about September 2006 through at least in or about September 2010, in the District and elsewhere, defendant GARFIELD TAYLOR unlawfully, willfully and knowingly, by use of means and instrumentalities of interstate commerce and the mails, directly and indirectly did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of a security, in contravention of Rule 10b-5 (Title 17, Code of Federal Regulation, Section 240.10b-5) of the Rules and Regulations promulgated by the United Sates Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engage in acts, practices and a course of business which would and did operate as a fraud and deceit upon persons in connection with the purchase and sale of a security.

**(Securities Fraud, Causing an Act to Be Done, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2)**

21

## COUNT SEVEN
### Unlawful Sale of Unregistered Securities
### (15 U.S.C. §§ 77e(a)(2) and 77x; 17 C.F.R. § 240.144; and 18 U.S.C. § 2)

98.     Paragraphs 1 through 94 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

99.     From at least in or about September 2006 through at least in or about September 2010, in the District and elsewhere, defendant GARFIELD TAYLOR unlawfully, willfully and knowingly, directly and indirectly, carried and caused to be carried, through the mails and interstate commerce, by means and instrumentalities of transportation, securities in the form of investment contracts, that is GTI investment contracts, for the purpose of sale and delivery after sale, there not being in effect with the United States Securities and Exchange Commission a registration statement as to such securities, in that TAYLOR caused to be sent, carried, and delivered by mail and in interstate commerce securities in the form of GTI investment contracts to individuals in the District and elsewhere who paid for them through the means of interstate commerce.

**(Unlawful Sale of Unregistered Securities, Causing an Act to Be Done, in violation of Title 15, United States Code, Sections 77e(a)(2) and 77x; Title 17 Code of Federal Regulations, Section 240.144; and Title 18, United States Code, Section 2)**

## CRIMINAL FORFEITURE ALLEGATION

1.     Upon conviction of the offenses alleged in Counts One through Five, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  The United States will also seek a forfeiture money judgment against the defendant in the amount of $24,426,998.

2.     If any of the property described above as being subject to forfeiture, as a result of

22

any act or omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(c), Title 28 United Sates Code, Section 2461(c))**

A TRUE BILL:

FOREPERSON

ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA

_____